UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | | |
|---|---|---|
| Grout Doctor Global Franchise Corp., | ) | Case No.: 7:14-CV-105-BO |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT and PERMANENT INJUNCTION** |
| Groutman, Inc., Doctor Plumber, LLC, & Gary Swanson, | ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to Rules 55(b)(2) and 65 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1, Plaintiff Grout Doctor® Global Franchise Corp. ("GDG") respectfully submits this Memorandum of Law in support of its Motion for Default Judgment and Permanent Injunction (the "Motion").

I. NATURE OF THE CASE

This lawsuit arises from Defendants' efforts to retaliate against a franchisor when their franchise relationship ended. The Defendants waged a campaign to steal the franchisor's intellectual property; misappropriate the franchisor's trade secrets; threaten and harass the franchisor's officers, employees, and affiliate vendors; mistreat customers while still acting in the guise of a franchisee; and breach their obligations of the franchise agreement.

On May 28, 2014, GDG filed a Verified Complaint seeking monetary damages and a permanent injunction to enjoin Defendants' wrongful conduct. (Doc. 5). The Verified Complaint contained detailed allegations and attached several exhibits documenting Defendants' trademark infringement, contract breaches, and other violations of state and federal law. (*Id.*). None of the Defendants answered the Verified Complaint. On September 22, 2014, the Court entered default against Defendants Groutman, Inc. ("Groutman") and Doctor Plumber, LLC ("Doctor Plumber"). (Doc. 26). On November 20, 2014, the Court entered default against Defendant Gary Swanson. (Doc. 28).

This matter is now before the Court on GDG's Motion for Default Judgment. (Doc. 29). Because the Court has entered default, the well-pleaded allegations of the Complaint are now taken as true. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the damages—is admitted if a responsive pleading is required and the allegation is not denied."). In deciding this Motion, "the court must consider whether the unchallenged facts support the relief sought." *Carrington v. Easley*, No. 5:08-CT-3175-FL, 2011 WL 2132850, at *2 (E.D.N.C. May 25, 2011) (citing *Ryan*, 253 F.3d at 780). Next, the Court must make an independent determination regarding damages. *Id.* The Court may determine the amount of damages based on affidavits or conduct a damages hearing.[1] *E.E.O.C. v. Carter Behavior Health Servs., Inc.*, No. 4:09-CV-122-F, 2011 WL 5325485, at *6 (E.D.N.C. Oct. 7, 2011), *report and recommendation adopted*, No. 4:09-CV-122-F, 2011 WL 5325473 (E.D.N.C. Nov. 3, 2011).

In this memorandum, GDG will explain why the undisputed facts establish GDG is entitled to relief on certain causes of action in the Verified Complaint. GDG will also prove the damages it is entitled to recover. Finally, GDG will explain why it is entitled to the entry of a permanent injunction.

## II. STATEMENT OF THE FACTS

Upon entry of default, the well-pleaded allegations of a complaint are taken as true. *Ryan*, 253 F.3d at 780; Fed. R. Civ. P. 8(b)(6). Thus, the factual allegations in GDG's Verified Complaint are deemed admitted. (*See* Doc. 5). In the interest of economy, GDG will not restate those allegations here. Rather, GDG incorporates its allegations by reference and, where necessary below, cites to the relevant numbered paragraphs of the Verified Complaint.

---

[1] GDG respectfully requests that the Court award damages based on the affidavits submitted with its Motion, but will produce witnesses to support its request for damages if the Court so desires.

### III. ARGUMENT

GDG respectfully requests that the Court enter judgment on the following causes of action, award monetary damages, and enter a permanent injunction as set forth below.

**1. Groutman and Swanson are liable for breach of contract (First Cause of Action)**

a. Liability

GDG has shown that both of the elements of a claim for breach of contract are met, namely: (1) existence of a valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

First, there was a valid contract between GDG, on the one hand, and Groutman and Swanson, on the other hand. The parties executed a Franchise Agreement in 2006, and renewed that Franchise Agreement in 2014 (the "Franchise Agreement"). (Compl. ¶¶ 35–36, 55; Doc. 29-2, at 2, 53). Second, Groutman and Swanson breached several provisions of the Franchise Agreement. Specifically:

- Groutman breached § 2.2.4, which required it to pay a $500.00 franchise renewal fee. (Compl. ¶¶ 37, 64).

- Groutman breached § 5.2, which required it to pay monthly royalty payments. (Compl. ¶¶ 38, 66).

- Groutman breached § 5.4.1, which required it to submit gross sales reports. (Compl. ¶¶ 39, 65).

- Groutman breached the provision requiring it to reimburse GDG for customer refunds. This was required by an operations manual that was incorporated in the Franchise Agreement. (Compl. ¶¶ 50–51, 58–63, 67).

- Groutman breached § 3.4.4, which prohibited it from applying for registration of GDG's trademarks. (Compl. ¶¶ 44, 89 – 91).

- Groutman breached § 3.6, which prohibited it from disclosing the contents of GDG's proprietary operations manuals to third parties. (Compl. ¶¶ 45–47, 85, 88).

- Groutman breached §§ 12.1.2 and 12.1.6, which prohibited Groutman, after termination of the Franchise Agreement, from using GDG's business system, trademarks, and proprietary manuals; and from holding itself out as a GDG franchisee. (Compl. ¶¶ 71, 74, 78–82).

- Groutman breached § 12.1.3, which required Groutman, after termination of the Franchise Agreement, to disassociate itself from the GDG franchise system. (Compl. ¶¶ 72, 78–82).

3

- Groutman and Swanson breached § 16.3, which prohibited them from engaging in grout repair services for two years after termination of the Franchise Agreement in Groutman's former territory (which generally encompassed the Wilmington, North Carolina area, *see* Doc. 5-8, at 56). (Compl. ¶¶ 69, 80–82).

- Groutman breached §§ 3.6, 12.1.6, which required it to return all GDG manuals after termination of the Franchise Agreement. (Compl. ¶¶ 73, 85, 109(m)).

Accordingly, GDG has satisfied both elements of its claim for breach of contract.

   b. Damages

For certain of Groutman and Swanson's breaches, GDG is entitled to monetary damages sufficient to provide GDG the benefit of its bargain. *Weber, Hodges & Godwin Commercial Real Estate Servs., LLC v. Cook*, 186 N.C. App. 288, 291, 650 S.E.2d 834, 837 (2007) ("As a general rule, the injured party in a breach of contract action is awarded damages which attempt to place the party, insofar as possible, in the position he would have been in had the contract been performed.")

First, Groutman failed to pay sums owed to GDG under the Franchise Agreement. In the attached declaration, GDG's Vice-President and Assistant Secretary has provided an accounting of the sums owed under the Franchise Agreement. (Second Declaration of Jeanine D. Sneyd, (Doc. 30-1)). Specifically, Groutman owes the following amounts:

| Amount Owed | Contractual Basis |
|---|---|
| $500.00 | Failure to pay franchise renewal fee (Compl. ¶¶ 37, 64) |
| $178.42 | Failure to pay monthly royalties (Compl. ¶¶ 38, 66) |
| $855.00 | Failure to reimburse GDG for customer refunds (Compl. ¶¶ 50–51, 58–63, 67) |
| **$1,533.34** | **Total** |

Second, GDG is entitled to recover lost profits it would have earned had Groutman not breached the Franchise Agreement. The Fourth Circuit, applying North Carolina law, held that a franchisor may recover "loss of prospective profits where the loss is the natural and proximate result of the [franchisee's]

breach." *Meineke Car Care Centers, Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 281 (4th Cir. 2011) (quoting *Mosley & Mosley Builders, Inc. v. Landin Ltd.*, 87 N.C. App. 438, 361 S.E.2d 608, 613 (1987)). In determining proximate cause, the principal question is whether the franchisee, through its breach, stopped the potential for future profits; or whether the franchisor, through its decision to terminate the franchise agreement, foreclosed future profits. *Id.* at 282–83.

In *RLB Holdings*, the court determined the franchisee's virtual abandonment of the franchise was the proximate cause of lost profits because that decision ensured the franchisor would no longer receive royalties and advertising fund contributions. *Id.* Here, as in *RLB Holdings*, Groutman abandoned the franchise when Swanson stated he no longer wished to operate as GDG's franchisee and declared his intent to operate as an independent company using GDG's trademarks. (Compl. ¶ 60). Furthermore, Groutman's breaches were so egregious that they constitute a *de facto* abandonment of the Franchise Agreement. (*See* Compl. ¶¶ 54, 56–63, 75–105). Thus, Groutman – not GDG – was the proximate cause of GDG's lost profits.

Once the franchisor establishes proximate cause, the franchisor then must satisfy this three-part test for lost profits:

> (1) that it is reasonably certain that such profits would have been realized except for the breach of contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may reasonably be supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of the breach.

*Id.* (quoting *Keith v. Day*, 81 N.C. App. 185, 196, 343 S.E.2d 562, 568 (1986)).

The *RLB Holdings* court concluded the franchisor could establish the first element by demonstrating that the franchisee historically earned some revenue, which triggered royalty payments. *Id.* at 283–84. Likewise, GDG has demonstrated that Groutman has historically earned sufficient revenue to pay monthly royalties. (Second Sneyd Decl., ¶¶ 9–10). Until termination, Groutman had paid (at the very least) the minimum monthly royalty payments due under the Franchise Agreement. (*Id.*). Thus, GDG has established the first element for recovery of lost profits.

5

In *RLB Holdings*, the franchisor established the second element by calculating projected loss profits as a function of the franchisee's past revenue. 423 Fed. App'x at 284–86. The court endorsed this approach, holding that it was "based on standards that allowed the jury to determine the amount of plaintiff's lost profits with reasonable certainty." *Id.* (quoting *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 409, 466 S.E.2d 324, 330 (1996)). Here, GDG's damages are calculated to a greater degree of certainty than the method used in *RLB Holdings*. GDG merely requests payment of the minimum monthly royalty payment ($416.31 per month) that would have been due for the duration of the 2014 Franchise Agreement. (Second Sneyd Decl., ¶¶ 9–10). This amount equals $34,375.31. Because Groutman often paid higher royalties, this method likely underestimates the true lost profits GDG has suffered.[2]

In *RLB Holdings*, the franchisee could satisfy the third element by pointing to the franchise contracts' 15-year term and grant of exclusive territorial rights. 423 Fed. App'x at 287–88. Furthermore, "the entire purpose" of a franchise relationship is to establish a long-term agreement whereby the franchisee paid royalties in exchange for using the franchisor's name, trademarks, procedures, and products. *Id.* Here, as in *RLB Holdings*, the 2014 Franchise Agreement contained a seven-year term and granted Groutman exclusive territorial rights. (Doc. 29-2, §§ 1.1.1, 2.1). The purpose of the Franchise Agreement was to establish a longstanding franchise relationship between GDG and Groutman. Indeed, Groutman renewed its franchise agreement in 2014 after already completing a 7-year term under the 2006 Franchise Agreement. GDG has satisfied the third element of lost profits damages.

In total, GDG is entitled to $35,908.73 for breach of contract damages.

    c. Injunction

---

[2] GDG is not required to prove that it attempted to mitigate its damages by, for example, refranchising in the Wilmington area. *RLB Holdings*, 423 Fed. App'x at 288 (noting that the defendant has the burden to prove failure to mitigate). At any rate, mitigation would have been futile because Groutman and Swanson's conduct has created an insurmountable barrier to refranchising in Wilmington. (Second Sneyd Decl., ¶ 13). *Cf. Smith v. Childs*, 112 N.C. App. 672, 685, 437 S.E.2d 500, 508–09 (1993) (acknowledging that a plaintiff is not required to take steps to mitigate its damages if "a reasonable person would have concluded such efforts would be futile").

Monetary damages are insufficient to compensate GDG for other breaches by Groutman and Swanson. For those breaches, GDG seeks a permanent injunction. To obtain a permanent injunction, GDG must establish that: "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 (1987). Here, the Court has already preliminarily enjoined Groutman and Swanson from "[c]ontinuing to breach post-termination obligations under the franchise agreement." (Doc. 23, at 4). Now that GDG has actually succeeded on the merits, GDG requests that the Court convert the preliminary injunction into a permanent injunction.

Even if the Court had not already entered a preliminary injunction, GDG can satisfy the four elements of a permanent injunction. As an initial matter, the Franchise Agreement expressly authorizes injunctive relief to compel "specific performance enforcing the provisions of" the Franchise Agreement. (Doc. 29.2, § 11.3.2). Moreover, several of Groutman and Swanson's breaches create irreparable injury that cannot be compensated by actual damages. For example:

- § 3.4.4 – Defendants' fraudulent applications for registration of GDG's trademarks cast doubt on GDG's legal right to license those marks – a right fundamental to GDG's ability to attract and keep franchisees in its system.

- § 3.6, 12.1.6 – North Carolina law recognizes that unauthorized disclosure of trade secrets causes irreparable harm. *See* N.C. Gen. Stat. § 66-154(a) (allowing injunctive relief to stop misappropriation of trade secrets).

- §§ 12.1.2, 12.1.3, 12.1.6 – GDG cannot undo the damage inflicted on its brand and its reputation every time Groutman and Swanson hold themselves out as a GDG franchisee.

- Section 16.3 – North Carolina law recognizes that a franchisee's violation of a non-competition covenant creates irreparable harm. *See Meineke Car Care Centers, Inc. v. Quinones*, 3:06-cv-87-MU, 2006 WL 1549708 (W.D.N.C. June 1, 2006) ("[A]llowing Defendants to operate a competing business in violation of the covenant not to compete allows Defendants to compete unfairly with Meineke and causes irreparable harm.").

Furthermore, the balance of the hardships tips in GDG's favor. Groutman and Swanson will suffer no unjustifiable hardship by being compelled to comply with their contractual obligations. GDG, on the other hand, will suffer the hardships set forth above without a permanent injunction. Finally, there is a strong public interest in enforcing mutually agreed upon contracts. *Great Am. Ins. Co. v. C. G. Tate Constr. Co.*, 303 N.C. 387, 391, 279 S.E.2d 769, 772 (1981) ("Freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written.").

GDG has satisfied the elements of a permanent injunction. GDG respectfully requests that the Court enter a permanent injunction that enjoins Defendants from breaching the obligations that survive the term of the Franchise Agreement.

### 2. **Swanson is liable for breach of a personal guaranty (Second Cause of Action)**

#### a. Liability

GDG has satisfied each of the elements to show that Swanson breached his personal guaranty to GDG. The elements for breach of guaranty are the same as the elements for breach of contract, namely: (1) existence of a valid contract and (2) breach of the terms of that contract. *Poor*, 138 N.C. at 26, 530 S.E.2d at 843 (2000).

Here, the Franchise Agreement contained a personal guaranty whereby Swanson promised to "jointly, individually and severally . . . guaranty the full performance of the terms and conditions of and liability for the aforesaid [2014] Franchise Agreement." (Compl. ¶ 56). Yet Swanson has not paid GDG the sums owed by Groutman under the 2014 Franchise Agreement. (Compl. ¶ 115(b)). Accordingly, Swanson is liable for breaching his personal guaranty agreement.

#### b. Damages

The personal guaranty requires Swanson to pay GDG the sums owed by Groutman under the 2014 Franchise Agreement. Accordingly, GDG is entitled to $35,908.73 in actual damages from Swanson.

### 3. All Defendants are liable for trademark infringement and unfair competition (Third and Fourth Causes of Action).

a. Liability

GDG has shown that Defendants are liable for infringement of its trademarks and unfair competition in violation of the Lanham Act. The elements are the same for trademark infringement under 15 U.S.C. § 1114 and unfair competition and false advertising under 15 U.S.C. § 1125. A plaintiff must show that: (1) it owns a valid trademark and (2) the defendant used the mark without authorization in commerce and in a manner likely to create consumer confusion. *Microsoft Corp. v. Computer Serv. & Repair, Inc.*, 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004) (citing 15 U.S.C. § 1114(1)(a); *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997)).

Here, the first element, GDG's ownership of valid trademarks, is satisfied by its registrations with the United States Patent and Trademark Office ("USPTO"), including THE GROUT DOCTOR, Reg. No. 2,395,447; the SURGEON LOGO, Reg. No. 2,525,210; PRETTY TILE, UGLY GROUT?, Reg. No. 2,567,299, and WE CURE SICK GROUT, Reg. No. 3,572,338 (the "Marks"). (Compl. ¶¶ 15–17; Docs. 5-2, 5-3, 5-4); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002).

The second element, Defendants' unauthorized use of the Marks in commerce, in a manner likely to cause confusion, is shown by numerous examples of set forth in GDG's Verified Complaint of Defendants' use of the Marks in connection with their sale, offering for sale, and distribution of the *How to Clean Tile and Grout* e-book on www.amazon.com, their advertising of services on the websites www.linkedin.com and www.angieslist.com, and their continuing provision of tile and grout repair services under the Marks (Compl. ¶¶ 81–82, 86, 97; Docs. 5-2, 5-3, 5-4, 5-10, 5-12, 5-19). Groutman's unlawful trademark applications (See Section 4 below) also contain sworn statements as to use of the Marks in commerce. (See, e.g., Doc. 5-14.)

9

As for the likelihood of confusion, it is well settled that "continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983). Confusion is also clear from the fact that complaints about Defendants' work after termination were directed to GDG, which would occur only if customers lodging those complaints thought that Defendants were associated with GDG. (Compl. ¶¶ 58–59, 62–63, 81).

Accordingly, GDG has established Defendants are liable for trademark infringement under 15 U.S.C. § 1114 and unfair competition and false advertising under 15 U.S.C. § 1125.

      b. <u>Injunction</u>

Courts have long acknowledged that injunctive relief is properly granted to restrain a former franchisee's continued use of a franchisor's registered marks. *See, e.g.*, *Am. Dairy Queen Corp. v. YS & J Enters., Inc.*, No. 5:14-CV-151, 2014 WL 1327017, at *2 (E.D.N.C. Apr. 2, 2014) (awarding injunction against former franchisee); *Meineke Car Care Centers, Inc. v. Catton*, No. 3:10-CV-234, 2010 WL 2572875, at *2 (W.D.N.C. June 24, 2010) (same). In this case, the Franchise Agreement expressly authorizes an injunction to prohibit "improper use of" GDG's trademarks. (Doc. 29 2, § 11.3.2). Additionally, this Court has already determined that an injunction is an appropriate remedy, as the Court preliminarily enjoined Defendants from continuing to infringe on GDG's Marks. (Doc. 23, at 4). Now that GDG has established liability, the Court may convert the preliminary injunction into a permanent injunction. *See Amoco*, 480 U.S. at 546 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). GDG respectfully requests a permanent injunction that enjoins Defendants from infringing GDG's Marks.

### 4. **GDG is entitled to cancellation of Defendants' application for registration of GDG's Marks (Fifth Cause of Action).**

"In any action involving a registered mark," district courts may "determine the right to registration, order the cancelation of registrations, . . . and otherwise rectify the register with respect to the

registrations of any party to the action." 15 U.S.C. § 1119. The Court may cancel a registration for any of the reasons that the United States Patent and Trademark Office may cancel a registration. *Shakespeare Co. v. Silstar Corp. of Am.*, 9 F.3d 1091, 1092 (4th Cir. 1993). Cancellations are proper where a mark is likely to cause confusion with a previously registered mark, 15 U.S.C. § 1052(d); where a registration is obtained fraudulently, i*d.* § 1064(3); or where the applicant does not or cannot legitimately exercise control over the use of the mark, i*d.* § 1064(5)(A).

Here, Defendants have filed applications for registration of GDG's SURGEON LOGO®, THE GROUT DOCTOR®, and the PRETTY TILE, UGLY GROUT? ® marks. (*See* Docs. 5-14, 5-15). The applications should be cancelled for each of the reasons set forth above, namely: (1) GDG already owns valid and subsisting registrations for these Marks. (Compl. ¶¶ 15–23). Thus, Defendants' registrations are likely to cause confusion with the Marks, and Defendants' applications are barred by 15 U.S.C. § 1052(d). (2) Defendants are attempting to obtain registrations through fraud. In particular, Defendants asserted under the penalty of perjury that they were the owners of the Marks, that no other person or entity had the right to use the Marks, and that GDG had abandoned the Marks. (Compl. ¶¶ 90–91). Those statements were false, as evidenced by Groutman and Swanson's affirmation in the Franchise Agreement that GDG had the "sole right to license, own and control the Marks." (Compl. ¶ 43). Thus, Defendants' applications are barred by 15 U.S.C. § 1064(3). (3) Because GDG owns the Marks, Defendants do not and cannot legitimately exercise control over their use. Thus, their applications are barred by 15 U.S.C. § 1064(5)(A).

In accordance with 15 U.S.C. § 1119, GDG requests that this Court instruct the USPTO to cancel Defendants' applications for registration of the Marks and order their fraudulent statements to be stricken from the USPTO register.

### 5. Groutman and Swanson are liable for misappropriation of trade secrets (Seventh Cause of Action)[3]

---

3   GDG does not seek a default judgment on its sixth cause of action for False Registration. At this time, Defendants have applied for registration, but have not yet obtained registrations. Should the Court order cancellation of Defendants' application, this sixth cause of action will be moot.

a. <u>Liability</u>

GDG has shown each of the elements required to prove that Defendants have misappropriated its trade secrets. Misappropriation of a trade secret means the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." N.C. Gen. Stat. § 66-152(1). Courts consider six factors to determine whether information is a trade secret: (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the effort or money expended in developing the information; and (6) the ease or difficulty others would have in properly acquiring the information. *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375, 542 S.E.2d 689, 692 (2001).

Here, Groutman and Swanson have already acknowledged that *How to Get the Gold Out of Grout* manual contains trade secrets. (Compl. ¶¶ 45–49). But even without this admission, GDG can establish that its manual constitutes a trade secret.[4] GDG has expended considerable financial resources developing the methods, techniques, processes, and other data comprising the Grout Doctor® System set forth in its manuals. (Second Sneyd Decl. ¶ 24). The 2014 Franchise Agreement describes the manuals as "secret, unique and confidential." (Doc. 29-2, § 3.6). GDG has restricted the use and disclosure of its manuals, as evidenced by the Franchise Agreement's provisions prohibiting disclosure of the manuals and providing for their return to GDG. (*Id.*). Thus, these materials constitute trade secrets under North Carolina law.

Defendants have acquired, disclosed, and used these trade secrets without authorization. When Groutman and Swanson abandoned their franchise relationship with GDG, they no longer had the right to use GDG's trade secrets and other confidential proprietary information. (Compl. ¶¶ 47, 73). They never had the right to disclose GDG's trade secrets to the public via the internet. (Doc. 29-2, § 3.6). Yet, Groutman and Swanson offered GDG's trade secrets for sale on www.amazon.com and continued to

---

[4] Likewise, this Court has already preliminarily enjoined Defendants from misappropriating the same trade secrets. (Doc. 23, at 4).

operate under the auspices of the GDG business system. (Compl. ¶¶ 78–86; Docs. 5-11, 5-12). Accordingly, GDG has established liability for its misappropriation of trade secrets claim.

      b. Damages

Misappropriation of trade secrets gives rise to both monetary damages and injunctive relief. N.C. Gen. Stat. § 66-154(a), (b). The plaintiff is entitled to recover "the economic loss or the unjust enrichment caused by misappropriation of a trade secret, whichever is greater." *Id.* Here, Defendants sold portions of GDG's confidential operations manual to 545 third-party purchasers on www.amazon.com for $0.99 per download. (Compl. ¶ 88; Doc. 5-12). Thus, Defendants were unjustly enriched by $539.55. However, GDG's economic loss is much greater because GDG could have instead used their trade secrets to sell grout cleaning services. (Second Sneyd Decl. ¶¶ 14–22). Because GDG's franchisees typically conservatively convert 37.1% of leads into grout cleaning jobs, and because Groutman typically charges $368.26 for standard grout cleaning services, the economic loss from lost sales equals $74,460.33. (*Id.*). From these sales, GDG would be entitled to a 9% royalty, which results in actual damages in the amount of $6,701.43 arising from Defendants' misappropriation of trade secrets. (*Id.* ¶ 22).

      c. Injunction

Under North Carolina law, the "actual or threatened misappropriation of a trade secret . . . shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists." N.C. Gen. Stat. § 66-154(a). Thus, upon establishing liability for misappropriation of trade secrets, an injunction follows as a matter of law. GDG therefore requests that this Court enter a permanent injunction enjoining Defendants from making illegal disclosures of and otherwise misappropriating GDG's trade secrets and confidential and proprietary information.

    **6. All Defendants are liable for unfair and deceptive trade practices (Eighth Cause of Action)**

      a. Liability

GDG has established that Defendants committed unfair and deceptive trade practices under North Carolina law. The elements for unfair and deceptive trade practices are: (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *Hester v. Hubert Vester Ford, Inc.*, __ N.C. App. __, 767 S.E.2d 129 (2015).

First, Defendants' misappropriation of trade secrets constitutes an unfair or deceptive act or practice as a matter of law. *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 670 S.E.2d 321 (2009) ("A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1."). Moreover, a breach of contract accompanied by aggravating circumstances also constitutes an unfair and deceptive trade practice. *Poor*, 138 N.C. App. at 28–29, 530 S.E.2d at 844–45. Aggravating circumstances include conduct that is deceptive. *Id.* The following conduct constitutes substantial aggravating circumstances accompanying Groutman and Swanson's breach of contract:

- Groutman and Swanson falsely certified to GDG that they were disassociating themselves from the GDG franchise system and that they were ending use of GDG's Marks. (Compl. ¶¶ 78–79).

- Groutman and Swanson made fraudulent representations to the USPTO regarding their ownership in the Marks. (Compl. ¶¶ 90–91).

- Groutman and Swanson made fraudulent representations about GDG to representatives of other governmental agencies. (Compl. ¶ 93).

- In an effort to gain business leverage, Groutman and Swanson have reported to governmental agencies that GDG and its personnel committed illegal acts. (Compl. ¶ 77).

- In an effort to gain business leverage, Groutman and Swanson have harassed and threatened GDG's personnel with baseless threats of criminal prosecution. (Compl. ¶ 75).

- In an effort to gain business leverage, Groutman and Swanson have interfered with GDG's business relationships with existing franchisees and with outside vendors. (Compl. ¶¶ 95, 97, 99–104).

Second, Defendants' conduct was in or affecting commerce. Chapter 75 defines "commerce" as "all business activities, however denominated." In determining whether a party's conduct falls within the statute, courts should consider the "impact the practice had in the marketplace." *Rucker v. Huffman*, 99

14

N.C. App. 137, 140, 392 S.E.2d 419, 421 (1990). Here, Defendants' conduct had a significant impact on the marketplace. Defendants have prevented GDG from providing its services to consumers in the Wilmington area; have damaged GDG's goodwill with the public; and have disseminated GDG's trade secrets to the public, which in turn prevents GDG from selling these services at a profit. Thus, the second element of this claim has been satisfied. Finally, Defendants' conduct has proximately damaged GDG, as described *supra* Parts. 1.b., 5.b.

    b. Damages

"Once a violation of Section 75–1.1 is shown the automatic assessment of treble damages is mandated by this statute." *Standing v. Midgett*, 850 F. Supp. 396, 402 (E.D.N.C. 1993); *see also* N.C. Gen. Stat. § 75-16. Accordingly, GDG requests that this Court award treble damages. For the damages arising out of the breach of contract claim, the treble damages equal $71,817.46, for which Groutman and Swanson are liable. For the damages arising out of trade secret misappropriation, the treble damages equal $13,402.86, for which all Defendants are liable.[5]

### 7. GDG is entitled to a permanent injunction (Ninth Cause of Action)

GDG has demonstrated above, with each cause of action, why it is entitled to a permanent injunction. To summarize, GDG requests a permanent injunction encompassing all of the following terms:

    a. Groutman and Swanson shall not violate the post-termination obligations of the Franchise Agreements. Without limitation, Groutman and Swanson shall comply with §§ 3.4.4, 3.6, 12.1.2, 12.1.2, 12.1.6, and 16.3 of the Franchise Agreement.

    b. Defendants shall not infringe GDG's trademarks. Without limitation, they shall not infringe the marks THE GROUT DOCTOR®, the SURGEON LOGO®, PRETTY TILE, UGLY GROUT? ®, or WE CURE SICK GROUT®.

    c. Defendants shall not misappropriate or otherwise disclose GDG's trade secrets or proprietary information. Without limitation, Defendants shall not sell GDG's trade secrets on

---

[5] GDG is entitled to recover treble damages under N.C. Gen. Stat. § 75-16, or punitive damages under the common law, but not both. *Bogovich v. Embassy Club of Sedgefield, Inc.*, 211 N.C. App. 1, 14, 712 S.E.2d 257, 266 (2011). GDG elects to recover treble damages under the statute, and therefore declines to pursue its tenth cause of action for punitive damages. (Doc. 5, ¶¶ 163–65). Alternatively, if the Court concludes that treble damages are not available, GDG requests that the Court consider an award of punitive damages.

www.amazon.com, particularly through the *How to Clean Tile and Grout* and *How to Tile* publications.

d. Defendants shall not harass or threaten GDG's officers, employees, franchisees, business partners, vendors, or agents.

e. Defendants shall not make false claims regarding GDG, its officers, employees, franchisees, or business partners to agencies or the United States and the State of North Carolina.

## 8. **GDG is entitled to pre- and post-judgment interest.**

GDG has shown that it is entitled to an award of pre- and post-judgment interest. "In an action for breach of contract . . . the amount awarded on the contract bears interest from the date of breach." N.C. Gen. Stat. § 24–5(a). The statute provides for pre- and post-judgment interest at the contract rate, so long as the parties have agreed that the contract rate shall apply after the judgment. *Id.* "Once breach is established, plaintiffs are entitled to interest from the date of the breach as a matter of law." *Cap Care Grp., Inc. v. McDonald*, 149 N.C. App. 817, 824, 561 S.E.2d 578, 583 (2002). In this case, the parties' contract sets the interest rate at 18%. (Doc. 29-2, § 5.4.4). Specifically, the 2014 Franchise Agreement states that Groutman and Swanson shall pay interest "both before and after judgment at the rate of eighteen percent (18%) per annum or the maximum rate allowed by law, whichever is less." (*Id.*). Groutman and Swanson's breaches occurred, at the very latest, on February 12, 2014, when GDG terminated the 2014 Franchise Agreement. (Compl. ¶ 68). Accordingly, GDG is entitled to pre- and post-judgment interest on its actual damages for breach of contract, which equal $35,908.73, at a rate of 18%, from February 12, 2014 until the judgment is satisfied.

Section 24-5 also provides for pre- and post-judgment interest on actual damages for non-contract claims. The statutory interest rate is 8%. N.C. Gen. Stat. § 24.1. The interest on actual damages runs from the date the action is commenced until the judgment is satisfied. *Id.* § 24-5. Accordingly, GDG is entitled to pre- and post-judgment interest on its actual damages for misappropriation of trade secrets damages, which equal $6,701.43, at a rate of 8%, from May 23, 2014 until the judgment is satisfied.

Section 24-5 also provides for post-judgment interest on other categories of damages, such as such as treble damages. The statutory interest rate is 8%. *Id.* § 24-5. The interest on treble damages runs from entry of judgment until the judgment is satisfied. *Id.* Accordingly, GDG is entitled to post-judgment interest on its treble damages, which equal $85,220.32, at a rate of 8%, from entry of judgment until the judgment is satisfied.

### 9. **GDG is entitled to attorneys' fees.**

GDG is entitled to recover attorneys' fees pursuant to 15 U.S.C. § 1117, and pursuant to N.C. Gen. Stat. § 75-16.1. In accordance with Fed. R. Civ. P. 54(d)(2), GDG will move for an award of attorneys' fees within 14 days of entry of judgment.

### IV. CONCLUSION

For the reasons stated above, GDG respectfully requests that the Court enter default judgment in favor of GDG, award actual damages, award treble damages, award pre- and post-judgment interest, and enter a permanent injunction.

Respectfully submitted this 27th day of February, 2015.

        **NEXSEN PRUET, LLC**

        /s/ *Corby C. Anderson*

        Corby C. Anderson
        N.C. Bar No.: 20829
        canderson@nexsenpruet.com
        Matthew S. DeAntonio
        N.C. Bar No.: 39625
        mdeantonio@nexsenpruet.com
        227 West Trade Street, Suite 1550
        Charlotte, North Carolina 28202
        Telephone: (704) 338-5331
        Facsimile:  (704) 805-4738

**CERTIFICATE OF SERVICE**

I certify that on February 27, 2015, I served the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT and PERMANENT INJUNCTION** upon all parties of record by U.S. Mail, addressed as follows:

>Groutman Inc.
>Doctor Plumber, LLC
>Gary Swanson
>511 N. 7th Street
>Wilmington, NC 28401

>/s/ *Corby C. Anderson*
>Corby C. Anderson (N.C. Bar No. 20829)
>
>*Counsel for Grout Doctor Global Franchise Corp.*