IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:14-CV-105-BO

| | |
|---|---|
| GROUT DOCTOR GLOBAL FRANCHISE ) <br> CORP., ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GROUTMAN, INC.; DOCTOR ) <br> PLUMBER, LLC; and GARY SWANSON, ) <br> Defendants. ) | **ORDER** |

This matter comes before the Court on plaintiff's motion for default judgment and permanent injunction pursuant to Rules 55(b)(2) and 65 of the Federal Rules of Civil Procedure. [DE 29]. For the following reasons, plaintiff's motion is GRANTED.

## BACKGROUND

This action arises out of a franchise agreement between plaintiff and defendants. Plaintiff Grout Doctor Global Franchise Corporation (GDG) franchises locally owned Grout Doctor stores throughout the United States, each of which specializes in tile and grout cleaning, repair, and maintenance. On May 28, 2014, plaintiff filed a complaint seeking monetary damages and a permanent injunction against defendants. Following a hearing at which Swanson represented himself pro se and defendants Groutman and Doctor Plumber were unrepresented, the Court granted plaintiff's motion for preliminary injunction. Swanson subsequently filed a motion to dismiss, which was denied on September 22, 2014. Defendants Groutman and Doctor Plumber filed no responsive pleadings and default was entered as to them on September 22, 2014. Following denial of the motion to dismiss, Swanson filed no responsive pleadings, and default was entered as to Swanson on November 20, 2014.

Because the Court has entered default, the well-pleaded allegations of the complaint are now taken as true. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *see also* Fed. R. Civ. P. 8(b)(6). The factual allegations in GDG's complaint are deemed admitted and the Court will not rehash them here, but will cite to the relevant paragraphs of the complaint when necessary.

## DISCUSSION

Rule 55 of the Federal Rules of Civil procedure authorizes the entry of a default judgment when a defendant fails "to plead or otherwise defend" in accordance with the Rules. Fed. R. Civ. P. 55(b). Although there is a strong preference that cases be decided on the merits, default judgment is "appropriate when the adversary process has been halted because of an essentially unresponsive party." *S.E.C. v. Lawbaugh*, 359 F.Supp.2d 418, 421 (D.Md. 2005). In a case involving a claim other than a claim "for a sum certain or a sum that can be made certain by computation," a party seeking default judgment must apply to the court. Fed. R. Civ. P. 55(b). When deciding a motion for default judgment, the Court first must consider whether the well-pleaded allegations in complaint support the relief sought. *Ryan*, 253 F.3d at 780. If the Court determines that liability is established, it must then make an independent determination regarding damages. *Id.* at 780–781; *See also Lawbaugh*, 359 F.Supp.2d at 422 ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."). The Court may determine the damages based on affidavits or it may conduct a damages hearing. *See, e.g., E.E.O.C. v. Carter Behavioral Health Servs. Inc.,* No. 4:08–CV–122–F, 2011 WL 5325485 at *6 (E.D.N.C. Oct. 7, 201), *report and recommendation adopted*, 2011 WL 5325473 (E.D.N.C. Nov. 3, 2011); *E.E.O.C. v. CDG Mgmt., LLC,* No. RDB–08–2562, 2010 WL 4904440, *2 (D.Md. Nov. 24, 2010).

1. Breach of Contract

To make out a valid claim for breach of contract under North Carolina law, a plaintiff must prove the existence of a valid contract and breach of the terms of that contract. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). Here, there was a valid contract between GDG and Groutman and Swanson. The parties executed a Franchise Agreement in 2006 and renewed it in 2014. Both Groutman and Swanson breached numerous provisions of the 2014 Agreement. Groutman, for example, failed to pay the $500.00 franchise renewal fee, the monthly royalty payments to GDG, and the reimbursement for the customer refunds. [DE 5, ¶¶ 37, 38, 50–51, 58–64, 66]. Both Groutman and Swanson engaged in grout repair services after termination of the 2014 Agreement in Groutman's former territory. [*Id.* at ¶¶ 69, 80–82]. Accordingly, GDG has satisfied its claims for breach of contract against Groutman and Swanson.

GDG is entitled to monetary damages. *Strader v. Sunstates Corp.*, 500 S.E.2d 752, 757 (N.C. Ct. App.) *disc. rev. denied*, 514 S.E.2d 274 (N.C. 1998). ("As a general rule, the injured party in a breach of contract action is awarded damages which attempt to place the party, insofar as possible, in the position he would have been in had the contract been performed."). First, Groutman failed to pay sums owed to GDG under the 2014 Agreement. Based on the declaration of GDG's Vice-President and Assistant Secretary, the Court finds that a damages hearing is unnecessary and that Groutman owes $500 for failure to pay the franchise renewal fee, $178.42 for failure to pay monthly royalties, and $855.00 for the failure to reimburse GDG for customer refunds. This totals $1,533.42 in sums owed under the 2014 Agreement.

GDG is also entitled to recover lost profits. *Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 281 (4th Cir. 2011) (holding that a franchisor may recover loss of prospective profits under North Carolina law where the loss is the proximate result of the

3

franchisee's breach). In determining proximate cause, the Court must consider whether the franchisee stopped the potential for future profits by breaching the franchise agreement or whether the franchisor foreclosed future profits by terminating the agreement. *Id.* at 282–83. If proximate caused is established, the franchisor must then demonstrate that it is reasonably certain the profits would have been realized but for the breach of contract, that the profits can be measured with reasonable certainty, and that the profits "may reasonably be supposed to have been made within the contemplation of the parties, when the contract was made, as the probable result of the breach." *Id.* (quoting *Keith v. Day*, 343 S.E.2d 562, 568 (N.C. Ct. App. 1986). Proof that the franchisee historically earned some revenue, thereby triggering royalty payments, is sufficient to establish that profits would have been realized. *Id.* at 283–84. The amount can be established by calculating projected lost profits as a function of the franchisee's past revenue. *Id.* at 284–86. And, where the franchise agreement had a definite term and a grant of exclusive territorial rights, the Fourth Circuit has found that the profits were within the contemplation of the parties when the contract was made. *Id.* at 287–88.

Here, Swanson stated that he no longer wished to operate as a franchisee and declared his intent to operate as an independent company using GDG's Marks prior to termination of the 2014 Agreement. [DE 5, ¶ 60]. Because Swanson and Groutman's abandonment of the franchise was the catalyst for the termination, it is clear that defendants' actions proximately caused the lost profits. *See, e.g., RLB Holdings*, 423 F. App'x 274 at 282–83. GDG has demonstrated via the declaration of its Vice-President that Groutman historically earned sufficient revenue to pay monthly royalties and until termination, had made at least the minimum monthly royalty payments. Accordingly, the Court finds that no hearing is necessary, as the minimum due under the Agreement—$416.31 per month—is a reasonably certain, measurable amount of lost profits.

4

As in *RLB Holdings*, the 2014 Agreement contained a seven year term and granted Groutman exclusive territorial rights. [DE 29–2, §§1.1.1, 2.1]. The purpose of the Agreement was to establish a longstanding franchise relationship between the two parties. Notably, this was the second franchise agreement between the parties, with Groutman having already completed a seven year franchise term. It is reasonable to assume, therefore, that the parties contemplated profits of the minimum royalty amount per month for the duration of the 2014 Agreement. Accordingly, GDG has satisfied all of the requirements for an award of lost profits and is entitled to $34,375.31 for the lost profits and $1,533.42 in amounts owed. The Court finds that $35,908.73 in breach of contract damages against Groutman and Swanson is appropriate.

2. Breach of Personal Guaranty

"A guaranty of payment is an absolute promise to pay the debt of another if the debt is not paid by the principal debtor." *Craftique, Inc. v. Stevens and Co., Inc.*, 364 S.E.2d 129, 131 (N.C. 1988). The elements of breach of guaranty, therefore, are the same as the elements for breach of contract: existence of a valid contract and breach of the contract's terms. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). The 2014 Agreement provided that Swanson would jointly, individually and severally guarantee full performance of the terms and conditions of the Agreement. [DE 5, ¶ 56]. Swanson has not paid GDG the sums owed by Groutman. Accordingly, Swanson is liable for breaching his personal guaranty. The personal guaranty requires Swanson to pay GDG the sums owed by Groutman under the 2014 Agreement. Swanson, therefore, is liable for $35,908.73 in actual damages.

3. Trademark Infringement and Unfair Competition

The elements for trademark infringement under 15 U.S.C. § 1114 and unfair competition and false advertising under 15 U.S.C. § 1125 are the same. A plaintiff must show that it owns a

5

valid trademark and that the defendant used the mark without authorization in commerce and in a manner likely to create consumer confusion. *Microsoft Corp. v. Computer Serv. & Repair, Inc.*, 312 F.Supp.2d 779, 784 (E.D.N.C. 2004) (citing 15 U.S.C. § 1114(1)(a)); *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997).

GDG has registered the Marks at issue in this case with the United States Patent and Trademark Office (USPTO)—The Grout Doctor®, the Surgeon Logo®, Pretty Tile, Ugly Grout?®, and We Cure Sick Grout®. [DE 5, ¶¶ 15–17]. Accordingly, the first element—its ownership of valid trademarks—is satisfied. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002). It is clear the defendants used the Marks in commerce, most notably by continuing to provide tile and grout repair services under the Marks after termination of the 2014 Agreement. [DE 5, ¶¶ 81–82, 86, 97]. Moreover, Groutman's unlawful trademark applications contain sworn statements as to the use of the Marks in commerce. [*Id.* at ¶¶ 90–91]. "Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). Here, it is clear that actual confusion occurred, given that complaints about defendants' work after termination were directed to GDG. [DE 5, ¶¶ 58–59, 62–63, 81]. Accordingly, GDG established that defendants are liable for trademark infringement under 15 U.S.C. § 1115 and unfair competition and false advertising under 15 U.S.C. § 1125.

4. <u>Cancellation of Defendants' Application for Registration of GDG's Marks</u>

"In any action involving a registered mark," district courts may "determine the right to registration, order the cancellation of registrations, . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119. Cancellations are proper where a mark is likely to cause confusion with a previously registered mark, 15 U.S.C. §

1052(d); or where a registration is obtained fraudulently, 15 U.S.C. § 1064(3). The Court may cancel a registration for any of the reasons that the USPTO may cancel a registration. *Shakespeare Co. v. Silstar Corp. of Am.*, 9 F.3d 1092, 1092 (4th Cir. 1993).

Here, defendants filed application for three of GDG's marks: the Surgeon Logo®, The Grout Doctor®, and the Pretty Tile, Ugly Grout?® Marks. GDG thus owns these Marks, thus defendants' registrations are likely to cause confusion with the already registered Marks. [DE 5, ¶¶ 15–23]. Moreover, by asserting under the penalty of perjury that they own the Marks and GDG had abandoned the Marks, defendants are attempting to obtain the Marks by fraud. [*Id.* at 90–91]. Accordingly, the Court finds that cancellation of defendants' application for registration of the Marks is appropriate and orders the applications cancelled and any fraudulent statements to be stricken from the USPTO register.

5. Misappropriation of Trade Secrets

The "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent" constitutes misappropriation of a trade secret. N.C. Gen. Stat. § 66–152(1). To determine whether information is a trade secret, courts consider: (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the effort or money expended in developing the information; and (6) the ease or difficulty others would have in properly acquiring the information. *Byrd's Lawn & Landscaping, Inc. v. Smith*, 542 S.E.2d 689, 692 (N.C. Ct. App. 2001).

Here, Groutman acknowledged that that *How to Get the Gold Out of Grout* contained trade secrets in the 2014 Agreement. [DE 5, ¶¶ 45–49]. The Agreement describes this and the

other Grout Doctor manuals as "secret, unique and confidential." The Agreement also prohibits disclosure and use of the manuals. The manuals constitute trade secrets under North Carolina law, and defendants have disclosed these trade secrets without authorization by publishing portions of them on the internet after the termination of the franchise relationship. Accordingly, GDG has established liability for its misappropriation of trade secrets claim.

Misappropriation of trade secrets gives rise to monetary damages and injunctive relief. N.C. Gen. Stat. § 66–154(a), (b). The plaintiff is entitled to recover "the economic loss or unjust enrichment caused by misappropriation of a trade secret, whichever is greater." *Id.* at § 66–154(b). The party seeking damages, however, "bears the burden of showing that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Medical Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 330 (N.C. Ct. App. 2009).

Here, defendants sold portions of GDG's confidential operations manual to 545 consumers on www.amazon.com for $0.99 per download, thus defendants were unjustly enriched by $535.55. [DE 5, ¶ 88]. Defendants posit that an average franchisee would have translated 37.1% of the downloads into actual grout cleaning jobs, which typically earn $368.26, for a total economic loss from lost sales of $74,460.33. The Court cannot find that it is reasonably certain that 37.1% of downloads of an electronic book would turn into grout cleaning jobs or franchisees. GDG has put forth no evidence that its typical "lead" includes downloading an e-book from the internet. As GDG's economic loss analysis is too speculative, the Court awards plaintiff $539.55 in unjust enrichment for misappropriation of trade secrets.

### 6. Unfair and Deceptive Trade Practices

Under North Carolina law, the elements for unfair and deceptive trade practices are 1) that the defendant committed an unfair or deceptive act or practice; 2) that the action that was in or affecting commerce; and 3) the act proximately caused injury to plaintiff. *Hester v. Hubert Vester Ford, Inc.*, 767 S.E.2d 129, 134 (N.C. Ct. App. 2015) (citing *Dalton v. Camp*, 548S.E.2d 704, 711 (N.C. 2001). Misappropriation of trade secrets constitutes an unfair or deceptive act or practice as a matter of law. *Ridgeway*, 670 S.E.2d at 329.. Moreover, a breach of contract accompanied by aggravating circumstances also constitutes an unfair and deceptive trade practice. *Poor v. Hill*, 530 S.E.2d 838, 844–45 (N.C. Ct. App. 2000). In determining whether a party's conduct affects commerce as defined by the statute, courts should consider the "impact the practice had in the marketplace." *Rucker v. Huffman*, 392 S.E.2d 419, 421 (N.C. Ct. App. 1990).

Here, defendants misappropriated trade secrets. They also breached a contract with plaintiff. Moreover, Groutman and Swanson made fraudulent representations to the USPTO regarding their ownership of plaintiff's Marks, harassed and threatened GDG's personnel, and interfered with GDG's business relationships with existing franchisees. [DE 5, ¶¶ 75, 90–91, 95, 97, 99–104]. All of these actions constitute aggravating circumstances and make it clear that defendants committed an unfair or deceptive trade act or practice. By preventing GDG from providing its services to consumers in the Wilmington area and disseminating GDG's trade secrets, defendants' actions impacted the marketplace in a manner that affects commerce. Lastly, defendants' conduct proximately damaged GDG, as laid out *supra*.

"Once a violation of Section 75–1.1 is shown the automatic assessment of treble damages is mandated by this statute." *Standing v. Midgett,* 850 F. Supp. 396, 402 (E.D.N.C. 1993); *see*

*also* N.C. Gen. Stat § 75–16. Treble damages for the breach of contract claim equal $71,817.46, and treble damages for the trade secret misappropriation constitutes $1,071.10, for which all defendants are liable.

7. Interest

GDG is entitled to interest. "In an action for breach of contract . . . the amount awarded on the contract bears interest from the date of breach." N.C. Gen. Stat § 24–5(a). "Once breach is established, plaintiffs are entitled to interest from the date of the breach as a matter of law." *Cap Care Grp., Inc. v. McDonald*, 561 S.E.2d 578, 583 (N.C. Ct. App. 2002). As long as the parties have agreed that the contract rate shall apply after judgment, the statute provides for pre- and post-judgment interest at the contract rate. Here, the contract sets the interest rate at 18%. Using the date of termination, February 12, 2014, as the date of breach, GDG is entitled to pre- and post-judgment interest on its actual damages, which equal $35, 908.73, at a rate of 18% from February 12, 2014, until the date the judgment is satisfied.

Section 24–5 also provides for pre- and post-judgment interest on actual damages for non-contract claims and other types of damages. N.C. Gen. Stat § 24–5(b). The statutory interest rate is 8%. N.C. Gen. Stat. § 24–1. The interest on actual damages runs from the date the action is commenced until the judgment is satisfied, while the interest on treble damages runs from entry of judgment until the judgment is satisfied. N.C. Gen. Stat § 24–5(b). GDG is entitled to pre- and post-judgment interest on its actual damages for misappropriation of trade secrets, which equal $535.55, at a rate of 8%, from May 23, 2014, until the judgment is satisfied, and post-judgment interest on its treble damages, which equal $72,888.56, at a rate of 8%, from entry of judgment until the judgment is satisfied.

8. Permanent Injunction

To obtain a permanent injunction, GDG must establish that "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987). The Court preliminarily enjoined GDG from "[c]ontinuing to breach post-termination obligations under the franchise agreement" on June 6, 2014, and GDG has now succeeded on the merits.

Injunctive relief is properly granted to restrain a former franchisee's continued use of a franchisor's registered marks. *See, e.g., Am. Dairy Queen Corp. v. YS & J Enters., Inc.*, No. 5:14–CV–151–BR, 2014 WL 1327017, at *2 (E.D.N.C. Apr. 2, 2014); *Meineke Car Care Ctrs., Inc. v. Catton*, No. 3:10–CV–234–RLV–DSC, 2010 WL 2572875, at *2 (W.D.N.C. June 24, 2010). Injunctive relief is also mandatory upon a finding of, the "actual or threatened misappropriation of a trade secret." N.C. Gen Stat. § 66–154(a).

GDG has established the elements necessary for a permanent injunction. It suffered an irreparable injury that cannot be compensated by monetary damages in the form of, *inter alia*, fraudulently applying for registration of GDG's trademarks and disclosing trade secrets. See N.C. Gen. Stat. § 66-54(a) (allowing injunctive relief to stop misappropriation of trade secrets). The balance of inquiries tips in GDG's favor, as defendants will suffer no unjustifiable hardship by complying with their contractual obligations. Moreover, there is a strong public interest in enforcing mutually agreed upon contracts. *Great Am. Ins. Co. v. C. G. Tate Constr. Co.*, 279

S.E.2d 769, 772 (N.C. 1981) ("Freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written.").

Accordingly, GDG is permanently enjoined from the following:

1) Violating the post-termination obligations of the Franchise Agreement;

2) Infringing upon GDG's registered Marks, including, but not limited to, The Grout Doctor®, the Surgeon Logo®, Pretty Tile, Ugly Grout? ®, or We Cure Sick Grout®;

3) Misappropriating or otherwise disclosing GDG's trade secrets and confidential and proprietary information, including, but not limited to, selling GDG's trade secrets on www.amazon.com through *How to Clean Tile and Grout*;

4) Harassing or threatening GDG's officers, employees, franchisees, business partners, vendors, or agents;

5) Making false claims regarding GDG, its officer, employees, franchisees, or business partners to agencies of the United States and the State of North Carolina.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for default judgment and permanent injunction is GRANTED. Judgment is entered in favor of plaintiff. All defendants are liable for actual damages for misappropriation of trade secrets with pre-and post-judgment interest at 8% running from May 23, 2014, and treble damages thereof with post-judgment interest at 8% running from the date of entry of judgment. Defendants Groutman and Swanson are liable for actual damages for breach of contract at $35,908.73, with pre- and post-judgment interest at 18%, running from February 12, 2014, and treble damages thereof with post-judgment interest at 8%, running from the date of entry of judgment. Defendants are permanently enjoined as laid out

12

Case 7:14-cv-00105-BO Document 30 Filed 05/15/15 Page 12 of 13

above, and the USPTO is directed to cancel defendants' applications for registration of the Marks and order their fraudulent statements to be stricken from the USPTO register.

SO ORDERED, this 14 day of May, 2015.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE